[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 12-14763
Non-Argument Calendar
_____

D.C. Docket No. 4:09-cv-00796-RDP-HGD

BERNARD JEMISON,

Plaintiff - Appellant,

versus

ROBERT SIMMONS,
GARY MALONE,
KENNETH HEFLIN,
BRYAN CHAPMAN,
STANLEY BATTLES,

Defendants - Appellees.

_____

Appeal from the United States District Court
for the Northern District of Alabama
_____

(May 16, 2013)

Before HULL, MARTIN and JORDAN, Circuit Judges.

PER CURIAM:

Bernard Jemison, an Alabama prisoner proceeding pro se under 42 U.S.C. § 1983, sued Officers Bryan Chapman and Stanley Battles, Sergeant Kenneth Heflin, Lieutenant Gary Malone, and Captain Robert Simmons (collectively, the Defendants[1]), alleging retaliation and excessive force in violation of his First and Eighth Amendment rights. Jemison was represented by counsel at a bench trial[2] where the parties agreed that he sustained certain injuries following his removal to a prison exercise yard on April 21, 2009, but disagreed about how and why Jemison came to be injured. The district court found in favor of the Defendants because it found their version of events more credible. Jemison now appeals.

## I.  FACTS AND PROCEDURAL HISTORY

Much of the evidence presented at trial was not in dispute. Bernard Jemison is an Alabama prisoner with a history of filing lawsuits against prison guards and other employees of the Alabama Department of Corrections. On April 21, 2009, while he was in the Segregation Unit at the St. Clair Correctional Facility, Jemison's cell flooded. Prison records introduced by Jemison indicate that prison staff noticed the flooding at approximately 12:26 p.m., and shut off the water to Jemison's side of the cell block four minutes later, at 12:30. At 12:46, prison staff

---

[1]  The Defendants are each employees (or former employees) of the Alabama Department of Corrections and worked at the St. Clair Correctional Facility in Springville, Alabama, the prison where Jemison alleged the constitutional violations to have occurred.

[2]  Jemison prepared his complaint pro se, but acquired counsel prior to trial. He dismissed his counsel immediately after the district court delivered its judgment and is proceeding pro se on appeal.

arrived to supervise the clean-up of Jemison's side of the cell block.  At 12:54, a maintenance worker isolated the water shutoff to Jemison's cell, and turned the water back on to the rest of the cell block.  Records further indicate that "[d]isciplinary action was taken on . . . Jemison" for having caused the flooding, but that he was nonetheless allowed to remain in his cell at that time.

However, more than two hours later, at around 3:00 p.m., Captain Simmons ordered that Jemison be removed from his cell.  The records show that at 3:10, Lieutenant Malone, Sergeant Heflin, and Officers Chapman and Battles, arrived at Jemison's cell, handcuffed him, shackled him in leg irons, and led him to the exercise yard.  The guards did not take Jemison to the exercise yard nearest his cell; instead they walked him to the yard outside cell block A.  In the exercise yard, the guards forced Jemison to lie on the ground.  Sometime later, the guards left the yard, leaving Jemison behind.  Jemison remained in the exercise yard, handcuffed and unattended, for approximately four hours.

All parties agreed that prior to leaving the cell block, Jemison had no visible injuries.  The same was not true when Sergeant James Marsh (a prison guard not named in Jemison's complaint) recovered Jemison from the exercise yard four hours later.  Before returning him to his cell, Marsh took Jemison to the prison infirmary, where a nurse examiner prepared a body chart at 7:00 p.m. documenting "whelps [and] bruises" around each of Jemison's wrists and ankles, and a "swollen

3

area" under his right eye.  The body chart also indicated that Jemison informed the nurse that the guards "beat him down [and] in the ribs."  The chart did not indicate, however, whether the nurse visually inspected Jemison's torso for signs of a beating.

One week later, on April 28, a prison doctor prescribed Jemison pain medicine to treat his "left low[er] rib pain."  This prescription followed an examination prompted by Jemison's complaints of significant pain in his "middle rib cage" due to an "altercation [with] Officer[s]" on April 21.  The doctor noted "[t]enderness" on the exam form, but once again did not indicate whether Jemison's torso was inspected for signs of abuse.

Although the parties agreed that Jemison suffered injuries on April 21, they disagreed significantly about the source of, and motivation behind, those injuries. Jemison stated in his complaint—executed on April 22, the day after the alleged attack—and testified at trial, that the Defendants removed him from his cell and took him to the exercise yard where they "hogtied" him by connecting his handcuffs and leg shackles to a "belly chain," and then beat him around the torso. According to Jemison, the beating occurred at the direction of Captain Simmons, who was frustrated by the "complaints that [Jemison] filed."  Jemison explained that the officers attempted to conceal their abuse by taking him to an exercise yard that could not be seen from his cell block, and by limiting their punches to his

4

torso, and claimed that the swelling around his eye was caused by "a wild punch" that inadvertently went too high. Jemison further explained that the guards hid the fact that they hogtied him by sending an unidentified "white, male officer" to remove his leg shackles and belly chain shortly before Sergeant Marsh discovered him in the yard.[3] Jemison testified that the nurse that examined him the day of the attack did not mark down the injuries to his torso because she saw him for only "two minutes" and never lifted his shirt, telling him instead, "I'll document what you tell me."

The Defendants had a different account of the source of Jemison's injuries on April 21. To the last man the Defendants denied involvement in an attack, and even that an attack occurred. The Defendants also denied that Jemison was hogtied. To explain why Jemison was removed from his cell more than two hours after flooding was initially observed, the Defendants each testified that at 3:00 p.m. "a large volume of water" remained in Jemison's cell and that Jemison was taken to the exercise yard so that the water could be cleaned up. The Defendants agreed with Jemison that they took him to exercise yard A because that yard is not visible from his cell block, though they stated that yard A is still fully visible by prisoners in other areas of the prison (specifically, cell block A). The Defendants justified their decision by explaining that in yard A Jemison was less likely to create a

---

[3] Sergeant Marsh, called to testify by the Defendants, stated that Jemison was not hogtied, shackled, or in pain when he found him in the exercise yard.

"problem" by "agitat[ing] the other inmates" than if he were left in the yard nearest his cellbock.

Because the Defendants left Jemison unattended in the yard for four hours, they could not offer a definitive explanation regarding the source of his injuries. However, as part of Jemison's redirect examination, Captain Simmons speculated that the bruising to Jemison's wrists and ankles was caused when Jemison "pulled against the handcuffs and leg irons," and that the swelling to his eye was caused by "fall[ing] into something." Finally, the Defendants argued that the nurse examiner did not indicate injuries to Jemison's torso because there were none to be found following a full examination, which included Jemison lifting his shirt.

After Jemison rested, the Defendants moved for judgment as a matter of law. The district court denied the motion because the issues in the case "turn[ed] on the credibility of the witnesses." The Defendants renewed their motion following a brief defense case (limited to the testimony of Sergeant Marsh), which the district court again denied, for the same reason. After closing arguments, the parties submitted the case.

The district court adjourned to deliberate Jemison's case and returned a verdict in favor of the Defendants. Emphasizing that "th[e] case boil[ed] down to a very simple, straightforward credibility match between the Plaintiff on the one side and the correctional officers on the other," the court credited the version of events

6

recounted by the Defendants. Specifically, the court found that Jemison was removed to the yard at the direction of Captain Simmons because water remained in his cell and needed to be cleaned up. Noting that the exercise yard was clearly visible from the windows in cell block A, and that the attack was alleged to have occurred during the daylight hours, the court simply did not believe Jemison's account. The court also discredited Jemison's version of his initial nurse's examination as having been cursory and unprofessional, explaining "I don't think that all the things that were documented on the medical chart could have been accomplished in two minutes." Finally, the court indicated that it "was particularly impressed with the testimony of . . . Lieutenant Malone, who very firmly said he would not allow [the beating] to happen; that is against their policy, and he would not permit that to occur," and that the minor inconsistencies in the remaining Defendants' testimony tended to corroborate Malone's account because such inconsistences indicated "heartfelt, credible answers," rather than "robotic answers."[4]

---

[4] It is not disputed that Jemison was left handcuffed and unattended in the exercise yard for four hours. The district court determined that this was due merely to the Defendants' negligence and was not sufficient, of itself, to create a constitutional violation. Jemison does not contest this point on appeal, and therefore he has abandoned any challenge to this determination. Timson v. Sampson, 518 F.3d 870, 874 (11th Cir. 2008) ("[I]ssues not briefed on appeal by a pro se litigant are deemed abandoned.").

This pro se appeal followed.  While his appeal was under review, Jemison filed with this court a motion for a preliminary injunction to prevent further mistreatment by the Defendants pending the outcome of his case.

## II. DISCUSSION

"We read liberally briefs filed pro se."  Lorisme v. I.N.S., 129 F.3d 1441, 1444 n.3 (11th Cir. 1997).  So read, Jemison's briefs raise two cognizable issues on appeal.  First he argues that the trial court erred in admitting prejudicial character evidence.  Second he argues that the district court's judgment was against the weight of the evidence.  We address each argument in turn.[5]

### A.

Jemison's first argument is that the trial court erred by admitting improper character evidence when it allowed Lieutenant Malone to testify that Jemison has a

---

[5]  Other issues that Jemison raises in his appeal are either not cognizable or have been waived. Jemison's claim that his trial counsel's performance was so substandard that it "deprived him of the right to receive a fundamental[ly] fair trial" fails because "there is no constitutional or statutory right to effective assistance of counsel on a civil case."  Mekdeci v. Merrell Nat'l Labs., 711 F.2d 1510, 1522 & n.19 (11th Cir. 1983) (quotation marks omitted).  Similarly, Jemison's argument that the district court violated his Sixth Amendment right to confrontation when it limited his redirect examination of Lieutenant Malone fails because "[t]he Sixth Amendment is limited by its very terms to criminal prosecutions," Little v. City of N. Miami, 805 F.2d 962, 968 (11th Cir. 1986), and the record does not otherwise indicate that the district court unreasonably restricted Jemison's questioning of Malone, see Fed. R. Evid. 611(a); Akouri v. Fla. Dep't of Transp., 408 F.3d 1338, 1346 (11th Cir. 2005).  Finally, Jemison's argument that the district court "committed plain error b[y] refusing to allow [him] to receive a trial by jury despite his request[] in [his] complaint" is waived because neither he nor his trial counsel objected to a bench trial despite: 1) having received ample notice that his case would be tried without a jury; and 2) having actively participated in the bench trial.  See Southland Reship, Inc. v. Flegel, 534 F.2d 639, 645 (5th Cir. 1976) ("[I]n a civil case a waiver (of right to jury after demand) is shown by mere acquiescence, when the party or his counsel is present and not objecting." (quotation marks omitted)).

history of flooding his cell, setting fires in his cell, and throwing feces at prison staff, and is generally known to have "a negative attitude." The district court admitted this testimony over Jemison's objection "for the limited purpose of . . . explain[ing] what [Malone] understood he was walking into when he was tasked with going into the cell." In its findings of fact, the district court relied on this evidence as the basis for why Malone and the other guards handcuffed and shackled Jemison, and removed him to exercise yard A while they cleaned his cell.

We review a district court's evidentiary rulings for abuse of discretion and will not reverse an evidentiary decision unless the ruling is "manifestly erroneous." Cook ex rel. Estate of Tessier v. Sheriff of Monroe Cnty., Fla., 402 F.3d 1092, 1103 (11th Cir. 2005) (quotation marks omitted). "Evidence of a person's character or character trait is not admissible to prove that on a particular occasion the person acted in accordance with the character or trait." Fed. R. Evid. 404(a)(1). Likewise, "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Fed. R. Evid. 404(b)(1). Finally, "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice." Fed. R. Evid. 403.

We are not convinced that the district court's decision to admit evidence of Jemison's prior behavioral problems was "manifestly erroneous." Cook, 402 F.3d

9

at 1103.  Malone's testimony was not admitted to prove that Jemison was acting

out on April 21.  Instead, as explained by the district court, the evidence was

admitted to explain why Lieutenant Malone and the other guards restrained

Jemison and removed him to yard A during the cleanup.  The district court relied

on Malone's testimony for precisely this purpose.  Thus, Jemison's argument that

the district court's judgment must be reversed because the trial judge admitted

improper character evidence fails.[6]

B.

Next, Jemison argues that the district court's judgment was against the

weight of the evidence.  In particular, he contends that the documentary evidence

he introduced at trial clearly contradicted the Defendants' testimony, which was

predictably "fabricated" and self-serving, and that the trial court's decision to

credit the Defendants' testimony over his exhibits and his own testimony

"create[d] a manifest injustice."

We review a district court's bench trial findings of fact for clear error, and

its conclusions of law de novo.  O'Ferrell v. United States, 253 F.3d 1257, 1265

(11th Cir. 2001).  When, as here, fact findings are based on credibility

---

[6] Additionally, even if we were to assume this evidence was inadmissible, "[i]n bench trials, judges routinely hear inadmissible evidence that they are presumed to ignore when making decisions." Harris v. Rivera, 454 U.S. 339, 346, 102 S. Ct. 460, 465 (1981); see also Gulf States Utils. Co. v. Ecodyne Corp., 635 F.2d 517, 519 (5th Cir. Unit A 1981) (indicating that "Rule 403 has no logical application to bench trials" because in a bench trial, the judge can exclude from his mind improper inferences drawn from inadmissible evidence in reaching a decision).

10

determinations we must give "even greater deference to the trial court's findings; for only the trial judge can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said." Anderson v. City of Bessemer City, N.C., 470 U.S. 564, 575, 105 S. Ct. 1504, 1512 (1985). When a district court's judgment "is based on his decision to credit the testimony of one of two or more witnesses, each of whom has told a coherent and facially plausible story that is not contradicted by extrinsic evidence, that finding, if not internally inconsistent, can virtually never be clear error." Id.

The district court did not commit clear error in crediting the Defendants' testimony over Jemison's. Contrary to Jemison's assertions, the documentary evidence introduced at trial did not contradict the Defendants' accounts of what occurred on April 21. The best that can be said about the extrinsic evidence is that it is incomplete, insofar as it does not indicate whether water remained in Jemison's cell when he was removed to the yard, or whether Jemison had injuries to his torso when he was examined by the nurse after being recovered from the yard. As such, the extrinsic evidence can be read to support both Jemison's and the Defendants' accounts, thus creating the "classic credibility fight between the two sides" identified by the district court. The district court's resolution of this credibility fight in the Defendants' favor was based upon the witnesses' "body language [on] the stand, eye contact during questions, . . . mannerisms while

11

testifying, and . . . what may or may not be perceived inconsistencies between the stories or within the stories."

We are hard-pressed to second-guess the district court's decisions to credit the Defendants' version of events, and to discredit Jemison's.  See Anderson, 470 U.S. at 575, 105 S. Ct. at 1512.  On this record we simply cannot say that the trial court clearly erred in determining that water remained in Jemison's cell when the Defendants removed him to exercise yard A, and that he was not beaten while he was there.[7]  O'Ferrell, 253 F.3d at 1265.  Thus, reviewed de novo, the evidence was sufficient to support the judgment for the Defendants.  Id.

### III.CONCLUSION

For these reasons, the judgment of the district court is AFFIRMED. Jemison's request for injunctive relief pending the outcome of this appeal is DENIED AS MOOT.

**AFFIRMED.**

---

[7] Neither are we persuaded by Jemison's assertion that the district court's "fail[ure] to issue a determination as to how [he] received his injuries," standing alone, constitutes reversible error. First, such a finding was not necessary to the conclusion that the Defendants did not attack Jemison in the yard.  Second, the only documented injuries in the record are the bruises around Jemison's wrists and ankles, and the swelling under his right eye.  As stated, Captain Simmons provided a plausible explanation for the source of these injuries upon questioning by Jemison, and no extrinsic evidence contradicted this testimony.

12